AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the

Southern District of West Virginia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>The patient files located, on March 2, 2010, in a safe<br>at 35 West Third Avenue, Williamson, WV | )<br>)<br>)<br>)<br>)<br>)    Case No.  2:10-mj-00037 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Exhibit A

located in the _____ Southern _____ District of _____ West Virginia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Exhibit A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

**FILED**

MAR – 1 2010

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1), 843(a)(2) and (3) and 18 U.S.C. §§ 1347 and 2 | Conspiracy to distribute controlled substances; distribution of controlled substances; conspiracy to obtain by fraud; conspiracy to misuse a registration number and health care fraud/aiding and abetting |

The application is based on these facts:
See Attachment C (Affidavit)

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

AUSA MONICA K. SCHWARTZ, atty for the United States
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 03/02/2010 _____

*Judge's signature*

City and state:  Charleston, West Virginia

MARY E. STANLEY, United States Magistrate Judge
*Printed name and title*

# COMPLETE Patient Seizure List





35, 36, 37
Redacted

2:10-mj·00035
00035
00036
00037

AFFIDAVIT

STATE OF WEST VIRGINIA,
COUNTY OF KANAWHA, to wit:

I, Monica K. Schwartz, being first duly sworn, do hereby depose and state as follows:

1. I am an attorney for the Government handling the investigation of the medical practice located at 35 West Third Avenue, Williamson, Mingo County, West Virginia, previously known as "Mountain Medical Care Center, LLC" and "Williamson Wellness Center" and currently believed to be possibly operating under the name of "Katherine Hoover Internal Medicine." Incorporated by reference herein is the Affidavit of Sgt. M. T. Smith of the West Virginia State Police, executed on or about February 26, 2010 in Magistrate Case Nos. 2:10-mj-00032 and 2:10-mj-00033.

2. During the execution of the search warrant in Magistrate No. 2:10-mj-00032 on March 2, 2010, certain patient records were found in a safe located within the medical practice. The names on these patient records are as follows:

a.
b.
c.
d.
e.
f.
g.
h.

ATTACHMENT C

3.   Based on the information developed to date in this case, it appears that these patient records may contain information relevant to the criminal charges being investigated because they were kept in a safe separate from the regularly maintained patient records.   Further, as indicated in the affidavits incorporated herein by reference, the patient file of ▓▓▓▓▓▓▓▓▓▓ is likely to contain sensitive and relevant information.

4.   At the beginning of the execution of the search warrant at 114 West Second Avenue, Williamson, West Virginia, authorized in Magistrate Case No. 2:10-mj-00033, I contacted counsel for Dr. Diane E. Shafer, the owner of 114 West Second Avenue, Williamson, West Virginia, to try to obtain Dr. Shafer's cooperation in providing a key to the searching agents.   Dr. Shafer is currently in plea negotiations with the United States.   Thereafter, I was advised by counsel for Dr. Shafer that there was a separate building (a house) owned by Dr. Shafer and located at 110 West Second Avenue, Williamson, West Virginia, wherein Dr. Katherine Hoover had a room and stayed during her work week.   The house in question is described as a yellow and white two-story dwelling with a brick front and vinyl siding with four large white columns in the front. It is located next to the 114 West Second Avenue building that has been used by Dr. Diane E. Shafer, M.D. as a medical office. Dr. Shafer, per her attorney, consented to the search of the common areas of the house and the bedroom used by Dr. Hoover.   Dr. Shafer

2

requested that her own bedroom, which is secured by a lock such as one would find on an entry/front door, not be searched. Subsequently, Dr. Shafer's counsel indicated that Dr. Shafer would consent to the search of her locked room.

5.    For the reasons indicated in the incorporated Affidavits, I hereby submit that there is probable cause to search the bedroom used by Dr. Hoover at the 110 West Second Avenue, Williamson, West Virginia address.

6.    Dr. Shafer is herself under investigation for various crimes as set forth in the Affidavit of FBI Special Agent James F. Lafferty, II in support of a search warrant for safe deposit boxes of Dr. Shafer in Case No. 2:10-mj-00005 (Affidavit is attached hereto and incorporated herein).  The United States notes that approximately $500,000 in cash and other valuables were seized from Dr. Shafer's safe deposit boxes and a related bank account on or about January 14, 2010.  The United States investigation on Dr. Shafer indicates that she was involved in illegal activity netting more than $1.36 million in 2009 alone.  Therefore, the United States submits that there is probable cause to search the locked bedroom of Dr. Diane Shafer, located within 110 West Second Avenue.

7.   The information to support the specific allegations herein was obtained by me from agents executing search warrants on March 2, 2010, who can be available by telephone to provide additional details.

Further your Affiant sayeth naught.

_Monica K. Schwartz_
MONICA K. SCHWARTZ
Assistant United States Attorney

Taken, subscribed and sworn to before me, this 2nd day of March, 2010.

_Mary E. Stanley_
MARY E. STANLEY
United States Magistrate Judge

4

Incorporated in
2:10-mj-00035,
36+
37

Redacted
3/30/10
MKS

AFFIDAVIT

2:10-mj-00032
2:10-mj-00033

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA, to wit:

I, M. T. Smith, being first duly sworn, do hereby depose and state as follows:

## I. INTRODUCTION

### A. Background of Affiant

1.    I, Sergeant M.T. Smith, graduated from West Virginia State University in May 1996, obtaining a Bachelor of Science Degree in Criminal Justice. I began my employment with the West Virginia State Police in October 1997, as a Cadet, and underwent physical, mental, and academic training relating to the skills associated with a law enforcement officer. I graduated from the West Virginia State Police Academy in March 1998, earning the rank of Trooper.

2.    I began my career in law enforcement as a Uniformed Field Trooper where I was a first responder, exposed to various situations and investigated a variety of crimes ranging from traffic offenses, to murders, burglaries, robberies, larcenies, and drug investigations.

3.    In October 2002, I requested and received assignment to the West Virginia State Police Bureau of Criminal Investigations. Here, I received additional training and experience focusing on drug investigations and more complex longer-term investigations. I also received experience in conducting controlled drug purchases with an informant and purchasing drugs

ATTACHMENT

undercover. I have personally been involved with hundreds of drug investigations and undercover operations. The types of drugs operations conducted varied from street level operations/investigations to multi-person conspiracies involving traditional drugs such as cocaine, cocaine base, marijuana and heroin. I have also obtained experience and training in the area of pharmaceutical drugs, such as Oxycodone, Hydrocodone, Xanax, Valium and other types of prescription drugs. I have also been involved in investigations that involved healthcare officials prescribing outside their course of practice.

    4.    Some of the academic courses that I have completed since being assigned to the West Virginia State Police Bureau of Criminal Investigations include:

Basic Drug Investigations Training by U.S. Army CID, WVSP Academy 11/18/2002 – 11/22/2002

Drug Diversion Training by the Virginia State Police, WVSP Academy, 2/4/2003   – 2/6/2003

Clandestine Laboratory Training by HIDTA, Newport, TN, 4/6/2003 – 4/12/2003

Site Safety Clandestine Laboratory Training, DEA Academy - Quantico, VA, 10/20/2003 – 10/23/2003

Undercover Survival /Street Tactics Training by HIDTA, London, KY, 8/17/2004 – 8/19/2004

Prosecuting Drug Cases by the National College of District Attorneys, New Orleans, LA, 10/30/2004 – 11/4/2004

Financial Investigative Techniques, London, KY, 7/11/2005 – 7/13/2005

Advanced Undercover and Survival Training by HIDTA, Lexington. KY, 7/31/2005 – 8/4/2005

Pharmaceutical Drug Investigations, Hazard, KY, 5/14/2006 – 5/15/2006

Drug Diversion Training, DEA Academy, Quantico, VA, 8/14/2006 – 8/18/2006

Hostage Negotiations Training by the FBI, WVSP Professional Development Center, 4/21/2008 – 4/25/2008

Undercover Operation Training by HIDTA, WVSP Professional Development Center, 10/7/2008 – 10/8/2008

5.      I have also served as a training officer to new members assigned to the Bureau of Criminal Investigations. I am also the instructor of the Drug Identification and Handling Course taught at the West Virginia State Police Academy, and have taught courses relating to drug investigations in yearly in-services training and assisted in the training of the Basic Drug Investigation Course taught to multiple agencies by the West Virginia State Police. I have also taught courses to law enforcement on the topic of prescription drug diversion.

6.      I have received Special Deputation through the United States Marshals Service and the Federal Bureau of Investigations to seek and execute, arrest and search warrants, and to also monitor Title III intercepts.

7.  The information contained in this affidavit has been obtained by or provided to me by individuals knowledgeable of the subject matter, including others in law enforcement who have provided me with information they have obtained during the ongoing investigation. Therefore, this

3

affidavit does not include every fact gathered during the course of this investigation, but simply includes selected facts needed to obtain the probable cause to obtain search warrants for:

(a) Mountain Medical Care Center, LLC, 35 West Third Avenue, Williamson, Mingo Co., West Virginia; and

(b) 114 West Second Avenue, Williamson, Mingo Co., West Virginia, and the attached building.

B. <u>Nature of Investigation</u>

8. The Drug Enforcement Administration (DEA), the West Virginia State Police (WVSP), the Department of Health and Human Services/Office of the Inspector General (DHHS/OIG), and the FBI are conducting an ongoing criminal investigation of the Mountain Medical Care Center, LLC, (Mountain Medical) (previously known as the Williamson Wellness Center (WWC)) located at 35 West Third Avenue in Williamson, West Virginia. I know from my personal observation and from my review of documents and statements of others, that Katherine Hoover M.D., William Ryckman, M.D., and J. Victorio Teleron, Jr., M.D., are/were physicians practicing at Mountain Medical. Investigation indicates that Dr. Hoover, Dr. Ryckman and Dr. Teleron have unlawfully distributed controlled substances to patients through Mountain Medical. The investigation has also revealed that Myra Miller, Camille Heslel, and other employees of Mountain Medical, conspired with the above named physicians, and others in unlawfully distributing and obtaining the controlled substances and in committing health care fraud.

9. This activity may constitute the following and other criminal violations:

    (a) 21 U.S.C. § 846(a)(1),  conspiracy to distribute  controlled substances;

    (b) 21 U.S.C. § 841(a) (1),  distribution of  controlled substances;

    (c)  21 USC § 843 (a) (2), use of a registration number issued to another person to distribute controlled substances;

    (d)  21 U.S.C. § 843(a)(3), obtaining controlled substance by fraud;

    (e) 18 U.S.C. § 1347, health care fraud; and

    (f) 18 USC § 2. aiding and abetting.

WILLIAM F. RYCKMAN, M.D.

10.  According to the West Virginia Board of Medicine website,  Dr. Ryckman's preferred mailing address as 127 American Lane, Sutersville, Pennsylvania. He does not list a current work address. Dr. Ryckman attended medical school at the State University of New York at Buffalo School of Medicine and Biomedical Science. His primary specialty is listed as a family practice. He has an active medical license with the state of West Virginia.  His license was originally granted in March of 1997.    Investigation  confirmed  that  Dr.  Ryckman  resides  at  127  American  Lane, Sutersville, Pennsylvania.

11. On June 8, 2004, the West Virginia Board of Medicine entered into an agreement with Dr. Ryckman.  This agreement was a result of a complaint of improper prescribing practices made on June 1, 2002, by Michael Burton, R.Ph. The complaint alleged that Dr. Ryckman, while living in the State of Pennsylvania, was telephoning controlled substance prescriptions to pharmacies in

West Virginia and Kentucky for patients who were being seen by a Physical Therapist at Ryckman's office in Williamson, West Virginia.

12. Upon receiving the aforementioned complaint, the West Virginia Board of Medicine initiated an investigation and secured the services of an independent physician. This physician reviewed ten (10) of Dr. Ryckman's patient files covering the periods of 2001 through 2002. The physician found that all of these patients were diagnosed as "chronic non-malignant pain patients." A report generated by the independent physician on May 14, 2003, outlined concerns that Dr. Ryckman offered little or no follow up re-evaluation on subsequent office visits, no evidence of x-ray reports, or special testing. All patients were seen on a monthly basis apparently for the sole purpose of renewing prescriptions for federally scheduled narcotics. The physician reviewed pharmacy printouts for Ryckman's patients and concluded that they were filling an "astronomical" amount of narcotic prescriptions. The reviewing physician formed the opinion that Dr. Ryckman failed to follow the guidelines of the West Virginia Board of Medicine for the use of opioids in the treatment of chronic "non-malignant" pain. The West Virginia Board of Medicine also concluded that Dr. Ryckman's record-keeping was inadequate to justify the course of treatment, and his prescribing practices, specifically controlled substances, were below the recognized standard of care.

13. As a result of the reviewing physician's report and the West Virginia Board of Medicine's findings, a Consent Order was filed on June 8, 2004. This Consent Order outlined the fact that Dr. Ryckman was publicly reprimanded for over prescribing narcotics to his patients, for deficiencies in medical diagnosis, treatment, and medical care. Dr. Ryckman was ordered to pay the State of West Virginia a civil fine in the amount of $2,500.00. Lastly, the Order directed Dr. Ryckman to successfully complete an intensive course in record keeping, and an intensive course

6

in controlled substance management, at his own expense. Dr. Ryckman was also ordered to provide documentation confirming that he had successfully completed the said courses.

KATHERINE A HOOVER, M.D.

14.   According to the West Virginia Board of Medicine website, Dr. Hoover's preferred mailing address as Route 2, Box 203, Lost Creek, Harrison County, West Virginia. Investigation verifies that this is her home address. Her primary work location is listed as Mountain Medical Care Center, 35 West 3rd Avenue, Williamson, West Virginia. (The investigation indicates that Dr. Hoover's primary residence is the Lost Creek address and that she generally resides there with her husband from Friday until Monday. She shares an apartment with Dr. Diane E. Shafer, at 114 West Second Avenue, Williamson, West Virginia during her work week. That apartment is accessed through 114 West Second Avenue, but is also partially contained within the attached building. Dr. Shafer is under investigation for conduct similar to that discussed herein. In December 2009, Dr. Shafer voluntarily surrendered her DEA registration and West Virginia medical license. )   Dr. Hoover attended medical school at the Michigan State University College of Human Medicine. Her primary specialty is listed as internal medicine. She has an active medical license with the state of West Virginia. She first obtained her license in July of 1978.

15.   On November 10, 2004, charges were filed against Dr. Hoover by the West Virginia Board of Medicine, in an amended complaint, alleging that, in October of 1995, Dr. Hoover while performing a gynecological exam on a seventeen year old patient, asked the patient if she and her friends would be willing to come to her home and have sex with her teenage sons. Dr. Hoover denied the allegations.

16. The hearings related to this complaint not only validated the complaint, but evidence surfaced that a letter allegedly written by a medical assistant who worked at the clinic where Dr. Hoover was seeing the patient, was actually written by Dr. Hoover. This letter was written to make Dr. Hoover look more favorable during the hearing.

17. In October of 2008, Dr. Hoover's license to practice medicine was put on probation for five (5) years. Dr. Hoover is only allowed to practice under the supervision of one or more physicians that were approved by the board.

J. VICTORINO R. TELERON, JR., M.D.

18. According to the West Virginia Board of Medicine website, Dr. Teleron's preferred mailing address 250 Whispering Woods Road, Charleston, West Virginia, which is also his home address. His primary work location is listed as 35 West 3rd Avenue, Williamson, West Virginia. Dr. Teleron attended medical school at the University of the Philippines, School of Medicine. His primary specialty is listed as internal medicine. He has an active medical license with the state of West Virginia. He first obtained his license in January of 1982.

C. Controlled Substance Violations

19. At all relevant times, Dr. Hoover possessed a valid DEA registration in West Virginia and was authorized to prescribe controlled substances. The current location of her registration is 35 West Third Avenue, Williamson West Virginia. At all relevant times Dr. Ryckman possessed a valid DEA Registration in West Virginia and was authorized to prescribe controlled substances. The current location of his registration is 35 West Third Avenue, Williamson, West Virginia. In approximately August 2008, Dr. J. Victorino Teleron began his employment at the Mountain

8

Medical Care Center. From August 11, 2008, Teleron was registered with DEA at 35 West Third Avenue in Williamson, West Virginia, and was authorized to prescribe controlled substances.

20.   A physician who wishes to possess, distribute, dispense, or prescribe controlled substances as part of his or her professional practice must do so pursuant to a DEA registration (21 U.S.C. § 822; 21 C.F.R. 1301.11).   A prescription for a controlled substance must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. 21 C.F.R. 1306.04(a).  It is a violation of 21 U.S.C. § 843(a)(2) to use a DEA registration number issued to another person to distribute controlled substances.

21. A physician violates 21 U.S.C. § 841 (unlawful distribution of controlled substances) when: (a) the physician distributes or dispenses a controlled substance;  (b) the physician acts knowingly and intentionally; and (c) the physician's actions are not for a legitimate medical purpose in the usual course of his professional medical practice or are beyond the bounds of medical practice. (United States v. Singh, 54 F. 3d 1182, 1186 ).

22. The term "controlled substance" means a drug or other substance included in Schedules I, II, III, IV and V as contained in 21 U.S.C. § 812 and 21 C.F.R. 1308.11, 12, 13, 14 and 15.

23. The term Lortab is a trade name for hydrocodone a schedule III controlled substance.

24. The term Xanax a trade name for alprazolam a schedule IV controlled substance.

25.   Both hydrocodone and alprazolam are popular drugs of abuse that are commonly obtained by fraud, diverted and sold on the streets for a profit.  Taken together they can produce a heightened affect for the drug user/abuser.

9

26. The term "distribute" means to deliver (other than by administering or dispensing) a controlled substance 21 U.S.C. § 802(11). This includes issuing prescriptions.

II. INVESTIGATION

27. Your affiant has knowledge from numerous patients of Mountain Medical, and through undercover visits to Mountain Medical, that the standard operating procedure regarding the prescribing of controlled substances used at the clinic is as outlined below.

28. A patient making his initial visit to the clinic is charged four hundred and fifty dollars. The cost of the visits has increased over the years. Medicaid and Medicare are not accepted. A majority of patients pay for their office visits with cash. On the patient's first visit he is seen by a practitioner. The majority of patients receive the same prescriptions (hydrocodone and alprazolam). It is generally requested that the patient obtain an MRI or X-Ray. All controlled substance prescriptions are called-in by the clinic and the patient is given a list of approved locally owned pharmacies located in West Virginia and Kentucky from which he may choose for his call-in to be placed. No re-fills are given on controlled substance prescriptions and patients are required to visit the clinic each time a prescription is needed. On subsequent visits the patient generally does not see a practitioner. Instead, the patient is simply asked by the receptionist if his complaint is still the same and if he has had any changes since the last visit. The patient's vital signs are taken and he is asked if he wants to see a practitioner. If the patient states that his complaint is the same and does not want to see a practitioner a prescription is called in for the same controlled substances as obtained during the previous visit. The patient is required to pay one hundred and fifty dollars for the follow up visits. In 2009, the clinic called in controlled substance prescriptions for approximately

175 patients per day, assuming a five day work week, fifty weeks a year.

COURT TESTIMONY

29. The following individuals provided testimony on the record in the Mingo County West Virginia Circuit Court. These individuals testified that they received their controlled substances from Mountain Medical. The individuals also described their experiences with Mountain Medical below:

(a) ███████████ testified on March 6, 2003, that he received Lortabs and Xanaxes from Dr. Ryckman. ██████ advised that he did not have any type of CT Scans, x-rays, or blood work performed at Mountain Medical. Instead, he told Dr. Ryckman that he had lower back pain and headaches. ██████ added that he did not see a physician on every visit, but would instead have the prescription called in by someone at Mountain Medical.

(b) ██████████ testified on March 6, 2003, that he obtained controlled substances from Dr. Ryckman. ██████ obtained these controlled substances after explaining to Dr. Ryckman that his back and head hurt. Dr. Ryckman did not perform any type of testing to determine what caused ██████ pain. ██████ also testified that Dr. Ryckman was not at the office during half of his office visits.

(c) ████████ testified on March 24, 2005, that he was addicted to Hydrocodone and received his prescription from Dr. Hoover at Mountain Medical for approximately three years. ██████ advised that he did not have any type of diagnostic testing conducted while under the care of Dr. Hoover, and only saw Dr. Hoover five or six times during the three year time period. Mountain Medical patients are generally required to at least visit the clinic once a month in order to continue receiving their prescriptions.

11

(d) ▇▇▇▇▇▇▇ testified on March 5, 2009, that he has been a patient of Dr. Hoover for approximately three years. He testified that he saw Dr. Hoover on his first visit and approximately five more times over a three year time period. Again, it should be noted that Mountain Medical patients are generally required to visit the clinic and pay $150 at least once a month, in order to continue receiving their prescriptions.

(e) ▇▇▇▇▇▇▇▇ testified on March 9, 2009, that he has been Dr. Hoover's patient for approximately eight years. ▇▇▇▇▇ has gone an entire year without seeing Dr. Hoover. Maynard would go to Mountain Medical and see one of the receptionist who he would pay for his office visit. He would then be called back, weighed, and have his blood pressure taken. He would then be asked if his medication was working, and where he wanted to fill his prescription. ▇▇▇▇▇ would use his month's worth of prescribed medication in under a week. ▇▇▇▇▇ was required to pay for an office visit once a month.

(f) ▇▇▇▇▇▇▇ testified on April 2, 2009, in criminal court Mingo County, West Virginia, where he was charged with selling his prescription medication. ▇▇▇▇ testified that the hydrocodone he was selling was prescribed by Dr. Hoover. ▇▇▇▇ advised that he would pay one hundred fifty dollars ($150.00) per office visit. After waiting fifteen to twenty minutes, his name would be called. He then would have his blood pressure taken, he would be weighed, and he would be asked a couple questions. ▇▇▇▇ estimated this meeting with staff lasted approximately five (5) minutes. He advised that he was receiving ninety (90) hydrocodone and thirty (30) Valium tablets. He advised that he saw Dr. Hoover maybe one time in two years.

12

(g) ▓▓▓▓▓▓testified on April 2, 2009, that she was receiving hydrocodone from Dr. Hoover as well as other physicians.▓▓▓▓▓added that she had to see a physician other than Dr. Hoover because Mountain Medical did nothing more than check your weight and blood pressure, and then call in your prescription. Records from the West Virginia Board of Pharmacy indicated that during a three (3) year time period, ▓▓▓▓▓has obtained hydrocodone and Xanax from multiple physicians while receiving the same type of medication from Dr. Hoover.

(h) Along with the aforementioned individuals, the following individuals also provided relevant testimony regarding their experiences as "patients" with Mountain Medical:

Court testimony: 

## WITNESS STATEMENTS

30. On Thursday, April 23, 2009, ▓▓▓▓▓▓▓▓ was interviewed. She advised that she had obtained prescriptions for hydrocodone and diazepam, also known as Valium, a schedule IV controlled substance, from Dr. Hoover from 2003 to 2007 at the WWC. ▓▓▓▓▓advised that she had heard through a friend you could visit WWC, say you had an injury, and receive hydrocodone. ▓▓▓▓▓advised that on her first visit she paid two hundred fifty dollars ($250.00) and filled out a large amount of forms. She stated she then had her vitals taken and waited to see the doctor. ▓▓▓▓▓ advised that she saw Dr. Hoover and told her that she had hurt her back at work and wanted pain medication. Dr. Hoover conducted a short exam and engaged her in conversation about her personal life.▓▓▓ advised she was then called in prescriptions for hydrocodone and diazepam.

31.▓▓▓ advised that she would travel from Barboursville, West Virginia, to WWC once

a month and pay one hundred fifty dollars ($150.00). The round trip would normally take in excess of three hours. (It was common for individuals to travel long distances to visit Mountain Medical.) ████████advised that she would then have her vitals taken and meet with a person believed to be a nurse. She stated she would also be asked what her pain was on a scale of 1-10. ████████advised that she would then have the same prescriptions called in to a pharmacy and she would pick them up.

32. ████████ advised that she never obtained an X-Ray or MRI while being seen from 2003 to 2007. She estimated that she saw Dr. Hoover three times. ████████ advised she was not placed on any type of treatment plan other than receiving prescriptions.

33. ████████ advised that most people are aware that WWC is a "pill mill" and that in her opinion a patient was simply providing cash in exchange for prescriptions. She described the office's practice as "like herding cattle through a process". She advised the staff was constantly hurrying to cycle individuals though the process. She stated she observed numerous individuals completing the same process to obtain prescription drugs, mainly Hydrocodone.████████advised that it was obvious most of the patients at WWC were drug seekers and the office was set up to provide them with those drugs. ████████advised that she also overheard individuals discussing selling their prescriptions while she was attending the office.

34. On April 20, 2006, a complaint was received by the DEA from ████████████ of ████, KY. ████████ a registered nurse employed through ████████████████, indicated that a relative of hers, ████████████, was receiving controlled substance prescriptions from the WWC and was addicted to, and abusing pharmaceuticals. ████████indicated that████████had been going to the WCC for approximately three years and obtaining prescriptions.████████indicated that

14

about four years ago, ███████ had an accident where she hurt her ankle. She was also involved in two auto accidents. ███████ did not believe that ███████ was receiving the controlled substance prescriptions pursuant to a valid medical need. ███████ indicated that ███████ had been arrested on several occasions for DUI of prescription medications and had been involved in accidents while under the influence of the prescription medications. ███████ indicated that the last accident had occurred approximately one week ago. The accident involved a four wheeler and that ███████ had been arrested for DUI regarding the prescription medication she obtained from the WWC. ███████ indicated that ███████ had gone through a drug rehab program in November of 2005, but was still receiving prescriptions through the WWC. ███████ stated that she had contacted the WWC by telephone five or six times within the past two years in an attempt to talk with a doctor to pass on the information regarding ███████ drug abuse problem. ███████ stated that she spoke with a receptionist on each occasion (name unknown) and was told that the information would be passed on to the doctor. ███████ stated that she was not allowed to talk to the doctor. When asked about other individuals from her community going to the WWC, ███████ indicated that the whole county goes there because it is known as the place to get drugs.

35.  On November 28, 2005, a telephone call was received at the DEA from an individual identifying himself as ███████ of ███████ ███████ called to complain about the WWC located in Williamson, West Virginia and the lack of care he had received at the center. ███████ indicated that while he had visited the WWC on numerous occasions, (receiving controlled substance prescriptions) he had only seen a doctor on one occasion.

36.  ███████ indicated that he was under total disability through West Virginia workers' compensation for leg problems and a back injury. ███████ indicated that he had first seen Dr. William

15

Ryckman in approximately 1996, when Ryckman was practicing with Dr. Diane Shafer in Williamson, West Virginia. ████ stated that when the WCC opened a few years ago he started treatment there. ████ indicated that he paid $450 on his first visit and saw Dr. Katherine Hoover, but on subsequent occasions he saw office staff (Mary LNU, Myra Miller) who weighed him and took his blood pressure and would then call in prescriptions for him (Hydrocodone and Alprazolam). ████ stated that some prescription bottles had listed Donald Kiser, MD as the prescribing physician but that ████ had never seen Dr. Kiser. Your affiant is aware that Dr. Kiser was a doctor employed at the WWC. ████ stated that all prescriptions were called in to the Food City Pharmacy in South Williamson, Kentucky. ████ indicated that he had stopped going to the WWC approximately four months ago.

37. A statement was taken from ████ of Delbarton, West Virginia, by the West Virginia State Police on January 18, 2008. ████ indicated he had been a patient of Dr. Hoover's since January of 2005 for a back injury. ████ stated that Dr. Hoover examined him during his first visit and wrote him prescriptions for Valium and hydrocodone. ████ was asked to pick from a list of four pharmacies where he would like to fill his prescriptions. Following the initial visit, ████ stated that for the next eight to ten months he would go to the office every two weeks. On these visits he would not see a doctor but would simply have his blood pressure taken and the office would call in prescriptions for him. ████ stated that he was not getting better so requested to see a doctor. ████ stated that when he asked to see a doctor the staff would get irritated and make him wait three to four hours before he could see Dr. Hoover. The last time ████ saw Dr. Hoover, she got mad and asked why he wanted to see her. ████ told her that he wanted to know why his back was hurting in a different area than it did originally. During ████ last visit to

16

the office he asked to see Dr. Hoover and got in an argument with "Myra". Your affiant believes "Myra" to be Myra Miller, Mountain Medical's office manager.

38.  According to ▇▇▇▇▇▇ "Myra" told him that he was being treated for a shoulder injury and not a back injury. ▇▇▇▇▇▇ thought that this was said as a way to get rid of him. ▇▇▇▇▇▇ stated that "Myra" told him that Dr. Hoover would not be seeing him anymore and threw ▇▇▇▇▇▇ out of the office. When ▇▇▇▇▇▇ returned the next day, Dr. Hoover would not see him and was referred to another doctor in Pikeville, KY. Robertson indicated that people in the area suggest that you go to Dr. Hoover's office (Mountain Medical) because she will write prescriptions and that Dr. Hoover's office (Mountain Medical) is simply a "pill mill."

39.  Along with the aforementioned individuals, ▇▇▇▇▇▇ also provided statements regarding his experience as a "patient" with Mountain Medical.

40.  On or about January 20, 2006, members of the West Virginia State Police arrested ▇▇▇▇▇▇ and ▇▇▇▇▇▇ for fraudulently obtaining controlled substances (hydrocodone) from WWC while receiving the same or similar drugs from other physicians (doctor shopping).

(a)  ▇▇▇▇▇▇ was interviewed on January 20, 2006. He advised that he was obtaining Hydrocodone from multiple physicians and was addicted to the same. ▇▇▇▇▇▇ advised he was referred to the WWC due to a knee injury. ▇▇▇▇▇▇ advised that he had been going to the clinic for one to two years. ▇▇▇▇▇▇ advised he saw Dr. Hoover during his initial office visit and that she asked him questions and looked at his knee. ▇▇▇▇▇▇ estimated that this meeting took less than fifteen minutes ▇▇▇▇▇▇ advised he then picked one pharmacy from a list of several provided

by the clinic and was called in Hydrocodone and Xanax. ████████advised that he did not ask for the Xanax. ████████advised that he then returned each month and went to what he described as a "bank teller window". ████████advised he would then provide a lady his name and date of birth. ████████would pay the "teller" cash and wait for his name to be called out over the loud speaker. ████████advised that he would have his weight and blood pressure taken. ████████would then pick his prescriptions up at the predetermined pharmacy. ████████advised that he was told by Dr. Hoover that the prescriptions were the only treatment that he would receive at this location. ████████advised that he also asked the staff why other doctor's names that he had not seen such as Dr. Ryckman and Dr. Kiser were on the prescription bottles. ████████was told that it was fine because it was a group of doctors.

   (b) On January 20, 2006, ████████████was interviewed pursuant to his arrest for obtaining a controlled substance by fraud. ████████recalled that approximately (6) six or (7) seven years prior to this interview he received a hip injury. ████████was referred to Dr. Hoover at Williamson, West Virginia, during treatment for that injury. Upon the first visit to Dr. Hoover, ████████advised that she sent him for an MRI and gave him a "check up." ████████advised that he then continued to visit Dr. Hoover's office approximately once a month over a (4) four to (5) five year period. During that time period ████████stated that he was "questioned by and saw a doctor" on approximately three to four occasions. ████████stated that during a majority of the visits to Dr. Hoover, he was generically evaluated by a nurse who would write down his "weight and blood pressure" prior to calling in a refill for his prescriptions at Family Discount Pharmacy in Logan, West Virginia. The prescriptions were for hydrocodone and Alprazolam. ████████stated that it was his understanding that patients went to Dr. Hoover and received refills while rarely being seen by

18

a doctor. ███████ stated, "It's obvious that everybody now goes there for pills."

    (c) Along with the aforementioned individuals, the following individuals were arrested for "doctor shopping" and provided statements regarding their experiences as "patients" with Mountain Medical:



41 . According to the WV Pharmacy Board prescription monitoring program, ███████ also known as "███" has received numerous controlled substances via prescriptions authorized by physicians who are working at or have worked at, Mountain Medical. ███████ is the ███████ ███████. The physicians whose names are on ███ prescriptions include:

    Donald Kiser
    William Gorby (now deceased)
    Katherine Hoover
    V. Teleron
    William Ryckman

42.  Generally, the clinic did not prescribe schedule II substances.  However in the case of ███████, a large number of schedule II controlled substances were prescribed (Oxycodone, Duragesic, Demerol, Fentanyl). Additionally, pharmacy reports indicate that ███████ has received Subutex prescriptions from both Dr. Teleron and Dr. Ryckman.  Both authorized Dr. Teleron and

Dr. Ryckman to prescribe subutex for drug treatment. Subutex is a brand name for Buprenorphine, a Schedule III controlled substance, also sometimes known as "Suboxone."

43. Pharmacy Board information indicates that Dr. Hoover has also prescribed Subutex to ▓▓▓▓▓ although Hoover is not approved to dispense/prescribe for drug treatment. Physicians are required to keep a record of the Subutex prescribed for drug treatment. 21 CFR 1304.03 (c). This can be kept in the individual patient chart.

44. Some of the prescriptions reflected in ▓▓▓▓▓ pharmacy records indicate that he may have also obtained drugs by fraud from physicians outside Mountain Medical.

45. Note: the United States is mindful of the provisions of 42 U.S.C. § 2 and seeks patient records which may contain drug treatment information in accord therewith, as the need for the information outweighs the potential injury to the patients. Further, the United States recognizes that special care must be taken with patient records reflecting "drug treatment" and that there are limitations on the use of such records. For example, they may not be used in a criminal investigation against the patient. The United States plans to treat "drug treatment" patient records as if they were grand jury material in this investigation, and would not disclose such records to individuals outside the investigation without a court order.

46. According to the West Virginia Board of Pharmacy Prescription Monitoring Program, ▓▓▓▓▓ has received numerous controlled substances from prescriptions authorized by Dr. Katherine Hoover, and Dr. William Ryckman, beginning in July of 2005 through June of 2009. Myra and J.J. Miller reside at 231 Central Avenue, South Williamson, Pike County, South Williamson, Kentucky.

20

<u>West Virginia Board of Pharmacy Reports</u>

47.  On September 1, 2002, the West Virginia Board of Pharmacy (WVBOP) implemented a program where a central repository was established and maintained all Schedule II, III, and IV controlled substance prescriptions written or filled in the state of West Virginia, as reported by the pharmacies filling the prescriptions.

48.  Agents obtained WVBOP reports for Drs. Hoover, Teleron, and Ryckman listing all controlled substances prescriptions written and filled for the relevant time periods.  Those reports were then summarized showing the number of individuals receiving prescriptions each day.

49.  Those summary reports showed that there were days when over 400 individuals filled prescriptions on one given day.  Agents then ascertained the three days with the highest number of individuals who had prescriptions issued by Dr. Hoover and obtained a 2.5 % random sample of all individuals who received controlled substances.  Agents also prepared lists showing the two days with the highest number of individuals who had prescriptions issued by Drs. Teleron and Ryckman and obtained a 2.5% random sample of those individuals who received controlled substances.

50. On Friday, November 30, 2007, 454 individuals filled controlled substance prescriptions under Dr. Hoover's name and DEA number.  A 2.5% sample or 11 of those individuals were randomly selected.  They are:



| Patient |
| --- |
|  |

51.    On Wednesday, January 2, 2008, 458 individuals filled controlled substance prescriptions under Dr. Hoover's name and DEA number.  A 2.5% sample or 11 of those individuals were randomly selected.  They are:

| Patient |
| --- |
|  |

52. On Monday, January 5, 2009, 444 individuals filled controlled substance prescriptions under Dr. Hoover's name and DEA number.   A 2.5% sample or 11 of those individuals were randomly selected.  They are:



53.   On Wednesday, October 1, 2008, 269 individuals filled controlled substance prescriptions under Dr. Teleron's name and DEA number.  A 2.5% sample or 6 of those individuals were randomly selected.  They are:



54. On Friday, October 30, 2009, 248 individuals filled controlled substance prescriptions under Dr. Teleron's name and DEA number.  A 2.5% sample or 7 of those individuals were randomly selected.  They are:



55.  On Monday, September 22, 2008, 163 individuals filled controlled substance prescriptions under Dr. Ryckman's name and DEA number.  A 2.5% sample or 5 of those individuals were randomly selected.  They are:



56. On Friday, November 20, 2009, 153 individuals filled controlled substance prescriptions under Dr. Ryckman's name and DEA number.  A 2.5% sample or 4 of those individuals were randomly selected.  They are:



24

UNDERCOVER VISITS

57.   Undercover (UC) visits have verified the information provided through public complaints and other sources of information. Below is a summary of those visits:

A. August 16, 2005

58.   The UC officer (████████ of the WVSP, ████████████████) entered the facility and approached the receptionist and was told the cost of the office visit would be four hundred and fifty dollars. Along with a patient questionnaire, the UC was given a narcotic contract prior to any conversation with a doctor. The UC indicated on the questionnaire that he had headaches and back pain. The UC then waited in the reception area to be called. While in the reception area, the UC spoke with another individual who was waiting who stated that Dr. Hoover was the one to see for pills, and that they (WWC) were going to require that the UC have an x-ray in order to cover themselves. After waiting approximately one hour the UC was weighed and his blood pressure taken and questions asked about his complaint. The UC then returned to the waiting area. After waiting another hour the UC was called to an exam room where an individual (believed to be Camille Swanson Helsel, a nurse practitioner) reviewed the UC's questionnaire and asked the UC how much pain he has on a scale of one to ten. Helsel indicated the number eight to which the UC agreed. Helsel listened to the UC's heart and lungs and had the UC bend over and twist. Helsel then left the exam room and talked with an individual believed to be Dr. Hoover in the hallway. Helsel told Dr. Hoover that the UC has good mobility and some pain when bending over. Dr. Hoover entered the room and asked the UC what he wanted to get back to doing to which the UC stated, "construction." Hoover then told the UC that he needed to exercise and gave the UC a photocopy of a list of

exercises. Dr. Hoover then left  the room.  Helsel gave the UC a prescription for an x-ray with a

diagnosis of lumbar sprain.  Helsel asked the UC which pharmacy he wanted to use to which the

UC responds, "the Wal-Mart in Logan." Helsel responded that they didn't use that pharmacy, and

the UC could fill his prescriptions at either the Family Pharmacy in Logan or Hurley's which was

down the street.  The UC indicated Hurley's. Helsel then advised the UC that the clinic  would call

in a prescription to Hurley's and the UC could make another appointment up front.  The UC

subsequently filled the prescription which had been called in under the authorization of Dr.

Katherine Hoover for ninety 7.5/500 hydrocodone, which were to be taken one tablet, three times

per day.

B. SEPTEMBER 14, 2005

59.  The UC informed the receptionist that he was there to get his prescription. The

receptionist told the UC that the fee was one hundred and fifty dollars which the UC paid. After

waiting approximately one hour, the UC has his blood pressure and weight taken by an unidentified

female.  The UC is asked what kind of pain level he has on a scale of 1 to 10 to which he responded

about an eight. The UC was asked why he did not have an x-ray taken after his previous visit, to

which the UC responded that he had no money for an x-ray, since he had paid $450 for his first visit.

The unidentified white female responded that the UC would have to see somebody (rather than just

be given a prescription) since he did not have an x-ray. The female stated that the UC should tell her

(the next person he would see) why he didn't get an x-ray and that maybe she'd let him slide (give

UC a prescription).  The UC returned to the waiting area and after waiting approximately two and

one half hours he was called into an exam room and seen by an individual believed to be Camille

Swanson Helsel.

26

60. The recorded conversation between the UC and Camille Swanson Helsel was transcribed as follows:

| | |
|---|---|
| Camille: | What are we treating you for?  Back pain? |
| U/C: | Yes Mam. |
| Camille: | So this is just your second visit here.  How's everything going? |
| U/C: | I'm still a little bit tender, sore. |
| Camille: | Why did you not get the x-ray done that (name not clear) ordered for you last time? |
| U/C: | I didn't have the money. |
| Camille: | Yea, but I'm gonna tell you how the law works, I'm not kidding you, she put you on ninety narcotics a month, if the Feds walk in right now I want them to be able to pick any fucking chart that they want to and I'll either be searching for what's wrong with you or I will have found why I think you need these rather than some Advil or tell you to go to Wal-Mart and tell you to buy some Tylenol. |
| U/C: | I understand. |
| Camille: | So you got to work with me here. |
| U/C: | I understand. |
| Camille: | We gotta get your chart up to date, even though you're a brand new patient so it looks like you've been here one time and you're already being non-compliant. |

27

61. Helsel went on to discuss UC's back pain and the requirement for the UC to get an x-ray. Helsel then told the UC that she would call in his medicine so that it would be ready. Helsel gave the UC a prescription for an MRI and told him that he was done. The UC checked with the receptionist who told the UC that the prescription would be called in to Hurley's. The UC left the WWC, went to Hurley Drug store and obtained ninety Hydrocodone 7.5/500 tablets based on the "call-in" prescription. The prescription was under the authorization of Dr. Katherine Hoover and is under a "sig" of 1 tablet 3 times per day for pain.

C. October 13, 2005

62. The UC entered the reception area and spoke with the receptionist, an unknown female. The female requested the payment of one hundred and fifty dollars for the visit which was paid by the UC. The UC indicated that he had brought an x-ray with him as requested. The UC was seen by an employee that identified herself as "Mary". (This may be Mary Yates, a nurse at the clinic.) The UC gave the x-rays to Mary and informed her that the doctor who took the x-rays said he couldn't find anything wrong with him. The UC told Mary that his pain in his back is about the same. He also asked Mary for some Xanax to help him with his sleeping. Mary documented the name of the doctor who took the x-ray, and gave the x-ray back to the UC. The UC then went to Family Discount Pharmacy in Mount Gay, West Virginia and filled the call-in prescriptions. The prescriptions consisted of 90 Hydrocodone 7.5/500 and 30 Alprazolam .5mg. The prescription bottles indicated that they had been called in under the authorization of Dr. William Ryckman. The UC had never been seen by Dr. Ryckman.

28

63. Following this UC visit, phone calls were made to the WWC by a member of the West Virginia State Police. The officer asked the unidentified female who answered the phone if he could speak with Dr. Ryckman. The female indicated that Dr. Ryckman was not in the office that day and that Dr. Chico was at the practice. She added that Dr. Ryckman would not be in anytime that day. During a second call the unidentified female indicated that she thought Dr. Ryckman might be back at the beginning of the following week but was not sure.

D. November 17, 2005

64. The UC entered the WCC and provides the receptionist with his name, date of birth, and one hundred and fifty dollars. The UC was then called back where he is seen by a female who weighed him and took his blood pressure. She then asked the UC if he smoked or was allergic to any medicine. The UC is then requested the UC to sign a form. The UC informed the female that he would like to pick his medicine up at the same pharmacy as before. The UC responds to the Family Pharmacy in Mount Gay, West Virginia, where he obtained ninety 7.5mg hydrocodone tablets and 30 .5mg Alprazolam tablets pursuant to "call-in" prescriptions from the WWC under the DEA registration and authorization of Dr. Hoover.

E. December 16, 2005

65. The UC entered the WWC and paid the receptionist one hundred fifty dollars and provided his name and date of birth. After a short wait, the UC was taken in to a private room. The UC was seen by a nurse who took his blood pressure. The nurse also asked him, on a scale of one to ten, how much pain he had. The UC said eight. The nurse asks the UC if he was taking any medication, if he was working, or if he smoked. The UC answered, "no", to the questions. The

29

nurse then asked the UC to sign a form pertaining to the questions that were just asked of him. The nurse asked the UC how long it has been since he has seen a doctor. He responds, "twice", meaning two doctor's visits. The UC was told he can pick his medicine up in "Logan", meaning the Family Discount Pharmacy in Logan, West Virginia. (This meeting lasted less than four minutes). The UC then obtained ninety (90) hydrocodone and thirty (30) Xanax from Family Discount Pharmacy in Logan. The prescriptions were issued under Dr. Ryckman's name and DEA number.

### DR. DONALD KISER, D.O.

66. In February 2005, Dr. Donald Kiser D.O. was arrested in Mingo County, on state charges and was later prosecuted federally on charges related to a conspiracy to distribute prescription drugs. In February 2008, Dr. Kiser was sentenced to eighty-seven months in prison. At the time of his initial arrest on the state charges, he was a physician employed at the WWC.

67. On May 29, 2007, Dr. Kiser advised that, in 2004, he had been practicing as an Emergency Room Physician at Williamson Memorial and was recruited by Myra Miller, office manager of the WWC , to go to work at WWC as an independent contractor.

68. Kiser advised that he was paid two thousand dollars ($2,000) a day by WWC for his services. Kiser advised that initially he was responsible for reviewing established patient files and calling in prescriptions. Kiser advised that he would then place patient charts in boxes corresponding with area pharmacies that the practice dealt with for the prescription to be called in. Kiser advised that from reviewing these charts, he noticed that it had been several years since some patients had seen a doctor. Kiser advised that Doctors Hoover's and Ryckman's patient files appeared very

limited in detail.  Kiser stated that it appeared the WWV was providing prescriptions in exchange for money.

69.  Kiser advised that as many as four hundred patients a day were processed through the practice while he was there. Kiser was asked why all the prescriptions were called in as opposed to being written out. Kiser advised that a physician could not physically write out all the prescriptions due to hand fatigue and it also prevents patients from altering the prescriptions.

70.  Kiser advised that the standard of practice for the office for cash payment was to charge a first time fee of three hundred fifty dollars. The patient was then seen by a doctor and established as a patient. Kiser advised that the patient would then choose a pharmacy from a pre-selected list of pharmacies.  Kiser advised that generally the patient was to have some sort of an x-ray or MRI conducted before their second visit.  Kiser advised that from that point on the patient was to return to the clinic every month, have their vitals taken by a nurse and would only see a doctor if they requested.  Kiser advised patients were then charged a lesser amount in cash for each additional monthly visit.  He stated he was not certain on the office prices due to him not being involved in the payment procedures.  Kiser advised that on one occasion there was no physician on duty at the clinic and he was provided with information to call in prescriptions while he was on duty at Williamson Memorial.  He advised that the other physicians (Hoover and Ryckman) did not like him questioning their prescribing habits or methods of treatment.  Kiser advised that members of the practice also did not approve of the discharging of patients for substance abuse.

71.  Kiser advised that at the time of his employment, Dr. Ryckman ran the clinic and Myra Miller was the office manager.  Kiser advised that the other practicing physicians were Dr. Hoover

31

and Dr. Chico.  Kiser advised that Dr. Ryckman [who lived in Pennsylvania] would make limited

appearances at the clinic.  Kiser advised that there were several other nurses or nurse technicians and

one nurse practitioner named Camille Helsel.  Kiser advised that he questioned Dr. Ryckman and

Hoover's practicing of medicine based on chart review and failure to see patients.  Kiser advised that

the majority of individuals receiving controlled substances are cash patients.  Kiser advised that there

is a different protocol for patients paying with insurance.

72.  Kiser advised that he later became aware that the several rooms at this practice were

being monitored by video surveillance.  Kiser advised that he observed a money counting machine

at the practice and overheard a conversation between Myra Miller and Dr. Ryckman where Ryckman

commented, "Why are we paying the accountants if they can not hide the money?"

73.  Kiser advised that he was discharged from the clinic after his initial arrest in the

beginning of 2005 by Dr. Ryckman through Myra Miller.  Kiser advised that he was also told by

Myra Miller that with his present charges he had become a "lightning-rod for the feds".  Kiser

advised that he was later given ten thousand dollars ($10,000) from Dr. Ryckman.

CAMILE HESEL

74.  On Wednesday, March 11, 2009, Camille Helsel was interviewed.  Helsel advised that

she was a nurse practitioner working at the Williamson Memorial Hospital and spoke to Myra Miller

about working at the WWC.  Helsel advised that she began her employment at the WWC in 2004,

after Dr. Donald Kiser had joined the practice.  Helsel advised that she was initially paid three

thousand dollars ($3,000) a week.

32

75. Helsel advised that when she first went to work at the clinic the doctors present were: Owner Dr. William Ryckman, Dr. Katherine Hoover, Dr. Donald Kiser and Dr. Eric Chico. Helsel advised that her job was to document and update patient's medical files. Helsel advised that it varied how many physicians would be on duty at a time, but generally it was one physician and some times the physician would only be available by telephone. Helsel advised that the clinic would average about one hundred fifty patients a day. On busy days, they would have as many as three to four hundred or more patients a day. Helsel advised that the patients were predominately (70%) cash patients and were paying four hundred fifty dollars ($450.00) for a first time patient and one hundred fifty dollars ($150.00) for established patients. Helsel advised that the practice generally only accepted insurance from individuals involved in crashes from KY due to "P.I.P.", which allowed them a guarantee of ten thousand dollars ($10,000.00), a patient. The patients were then referred to the Aquatic Rehab Center across the street until the said amount was exhausted and then the patient became a cash patient returning to the clinic monthly.

76. Helsel advised that she agreed to take over as owner of the WWC in January 2006, after Dr. Kiser's arrest on State charges. She agreed to "pay" Dr. Rykman the previous "owner" $25,000 a month for five years. Helsel then changed the clinic's name to Mountain Medical. The ownership change was also reflected on the West Virginia Secretary of State's website. Myra Miller was listed as a member and the agent for service of process. This change may have been made, at least in part, because of the criminal charges against Dr. Kiser and the fear that the clinic and its owner would be coming under greater scrutiny.

77. Helsel advised that Dr. Hoover was the "bread and butter of the operation" because she would prescribe to anyone thereby generating the largest income for the clinic.

33

78.   Helsel advised that the clinic would average one hundred and fifty and up to four hundred "patients" a day.  She advised that with the money generated from the first week of the month, all salaries and overhead for the month could be met.  The remaining three weeks' income was pure profit for the business.

79.   Helsel advised that Dr. Hoover used poor documentation when prescribing and she, Helsel, and other nurses had to document the charts to make them appear proper in documentation in the event they were searched by law enforcement. Helsel advised that she and others had brought to Dr. Hoover's attention  individuals suspected of diverting or abusing the controlled substances they were being prescribed.  Hoover continued to prescribe to those individuals.

80.   Helsel advised that usually there was a doctor present at the clinic or was available by telephone.

81.   Helsel described the practice as pain management, but indicated that very few schedule II controlled substances are prescribed for treating pain at this practice. Helsel advised that she was aware of other pain management practices that would prescribe mostly schedule II's. Helsel advised that schedule II's would be better for the patients, because of the damage done to the patients' internal organs by the Tylenol in the Hydrocodone. Helsel advised that they do not prescribe schedule II's in order to maintain a low profile and avoid attention from the authorities.

82.   Helsel advised that she suspected about half of the patients were either drug addicts or were selling the prescription drugs that they obtained. Helsel advised that about half of the patients might actually need the narcotics prescribed. Helsel advised that pain is subjective and, that, in her

34

opinion, if someone obtains hydrocodone from the clinic and sells it, then that is between that person and law enforcement.

83. Helsel advised that she believed money was being embezzled or misappropriated from the business and that if an investigation was conducted the money generated from this practice could not be accounted for by the principals. Helsel advised that the cash generated from the business was handled by Myra Miller and employee, Teresa Channels. Helsel advised that money obtained was to be deposited daily at the BB&T Bank in Williamson, West Virginia.

84. Helsel advised that she had no control over the company's finances and that in February 2009, she attempted to pay Dr. Ryckman by check twenty five thousands dollars ($25,000) from the business account and the check did not clear. Helsel advised she later found out that the account had been drained. Helsel advised that as owner she was paid twenty eight thousand dollars a month ($28,000) and her taxes on that money were taken care of by Mountain Medical.

85. Helsel also advised that she always suspected that Dr. Hoover was also obtaining cash from the business based on the fact that Dr. Hoover was being paid just four thousand dollars ($4,000) a week and that salary figure appeared low compared to others salaries and the role that she played in the clinic's operation. Helsel advised that Dr. Hoover stayed in Williamson through the week and traveled back to her home in northern West Virginia on the weekends.

86. Helsel stated that on one occasion, no physician was present at the clinic. She was very busy documenting patient files and noticed that she had completed one hundred fifty (150) patient charts without eating lunch. Helsel advised she also noticed she had three first-time patients. Helsel said she approached Myra Miller, who was speaking to another unknown person about taking a break

35

and was told to get back to work. Helsel advised that she informed Myra that she had seen 150 patients and had three first-time patients waiting. Helsel informed Myra that she was taking a break and walked outside to smoke a cigarette. Helsel advised that she was approached outside by Myra Miller and was told to "not ever fucking discuss numbers of patients in front of anyone else. Don't you ever do that again!"

87.  Helsel advised that Kiser left the practice due to legal issues regarding a criminal matter. Dr. Chico left the pain management side of the clinic due to complaints that he spent too much time with patients and would not agree with Hoovers prescribing practices and was "running" off to many patients. Dr. Chico was refused to write controlled substances to people that he felt did not need them. Helsel advised that Chico kept some of Hoover's files as examples of illegal prescribing acts and threatened to turn the same over to the "feds" if she messed with him.

88.  According to Helsel, Dr. Chico was still associated with the clinic but only for drug treatment. (It is believed that Dr. Chico provides Suboxone treatment for opiod addiction at another nearby location.  Hydrocodone is an opoid.) Helsel advised that for, a period of time, the only doctor with the clinic was Hoover. Helsel advised that Dr. Teleron came on staff in October of 2008 to oversee Hoover due to an issue with the Medical Board. Helsel advised that she has never seen Teleron.

ANALYSIS OF WEST VIRGINIA BOARD OF PHARMACY

89.  According to prescription records from the West Virginia Board of Pharmacy,   for the period of December of 2002, until January 25, 2010, Dr. Hoover was the number one prescriber of controlled substances in West Virginia, based upon the number of prescriptions filled under her DEA

and was told to get back to work. Helsel advised that she informed Myra that she had seen 150 patients and had three first-time patients waiting. Helsel informed Myra that she was taking a break and walked outside to smoke a cigarette. Helsel advised that she was approached outside by Myra Miller and was told to "not ever fucking discuss numbers of patients in front of anyone else. Don't you ever do that again!"

87.   Helsel advised that Kiser left the practice due to legal issues regarding a criminal matter. Dr. Chico left the pain management side of the clinic due to complaints that he spent too much time with patients and would not agree with Hoovers prescribing practices and was "running" off to many patients. Dr. Chico was refused to write controlled substances to people that he felt did not need them. Helsel advised that Chico kept some of Hoover's files as examples of illegal prescribing acts and threatened to turn the same over to the "feds" if she messed with him.

88.   According to Helsel, Dr. Chico was still associated with the clinic but only for drug treatment. (It is believed that Dr. Chico provides Suboxone treatment for opiod addiction at another nearby location. Hydrocodone is an opoid.) Helsel advised that for, a period of time, the only doctor with the clinic was Hoover. Helsel advised that Dr. Teleron came on staff in October of 2008 to oversee Hoover due to an issue with the Medical Board. Helsel advised that she has never seen Teleron.

## ANALYSIS OF WEST VIRGINIA BOARD OF PHARMACY

89.   According to prescription records from the West Virginia Board of Pharmacy,  for the period of December of 2002, until January 25, 2010, Dr. Hoover was the number one prescriber of controlled substances in West Virginia, based upon the number of prescriptions filled under her DEA

36

registration number as reported by pharmacies in West Virginia. Since December 2002, there have been 355,132 prescriptions for controlled substance issued under her DEA number. This figure does not include Dr. Hoover's controlled substance prescriptions filled in Kentucky, which is very close to her Williamson, West Virginia office.

89. Law enforcement contacted the Mountain Medical office anonymously and was informed that "the doors open at 7:00 am and the doctor's window opens at 7:30 am." The officer was also advised that the clinic closes at 4:00 pm every day, Monday through Friday.

90. The West Virginia Board of Pharmacy's database reveals that in 2009, Dr. Hoover had 30,472 unique patient scripts. ("Unique patient scripts" means the number of individuals who filled controlled substance prescriptions under that physician's DEA registration number.) Dr. Teleron had 12,205 unique patients scripts filled under his DEA number in 2009. Dr. Ryckman had 1,176 prescriptions filled under his DEA number. Using the unique patients data described above for Dr. Hoover, Dr. Ryckman, and Dr. Teleron, and assuming that 70% paid at least $150 per visit, Mountain Medical had total revenue intake in 2009 of $4,604,565, in cash. This number is conservative as new patients paid up to $450 per visit and it does not include "P.I.P." income.


FINANCIAL INVESTIGATION

91. On April 28, 2009, Dr. Ryckman opened three accounts XXXXXXXXX6880; XXXXXXXXX6899; and XXXXXXXXX6902, at the BB&T Williamson, West Virginia branch. Teresa Channels, who represented that she worked for Dr. Ryckman, immediately began depositing large amounts of cash into account XXXXXXXXX6880. The cash deposits occurred on almost a

37

daily basis and were approximately $20,000 each.  Between April 28, 2009, and July 24, 2009, $1,009,805, in cash was deposited into account XXXXXXXXX6880.

92.  Your affiant believes that this financial activity corroborates Heslel's being removed as the "owner." It appears that Ryckman opened these new accounts after the old account that was known to Heslel was closed in February of 2009.

93.  On September 1, 2007, Katherine Hoover, residing at Rt. 2, Box 203, Lost Creek, West Virginia, purchased a 2007 BMW, Model 335I convertible, VIN #WBAWL73597PX50531, from A&L Motor Sales, located in Monroeville, Pennsylvania, for $53,675.  Dr. Hoover paid a $17,000 cash down payment on the vehicle.   The balance due on the vehicle was $36,750.  The West Virginia Department of Transportation Division of Motor Vehicles provided a DMV-1-TR, Application for a Certificate of Title for a Motor Vehicle, signed by Katherine A. Hoover, Rt. 2, Box 203, Lost Creek, Harrison County, West Virginia 25661.  The vehicle, a 2007 BMW Model 335I convertible, VIN #WBAWL73597PX50531, is listed as being free and clear of any liens and encumbrances.

94.  Your affiant has reviewed wage reports for Mountain Medical Care Center, LLC.  Myra Miller earned, from the 1st quarter of 2006 through the 4th quarter of 2008, total wages of $1,163,842.70.  William F. Ryckman, MD began paying wages to Myra Miller in the 2nd and 3rd quarter of 2009.  Myra Miller received total wages of $193,776.

95.  In 2009, West Virginia wage reports for the second and third quarters,  for the clinic do not show wages paid to Dr. Hoover. Bank records from account XXXXXX7905 maintained by Dr. Hoover at Wesbanco Bank, Inc., show that Dr. Hoover received  fairly  regular checks from Dr.

to accumulate large sums of cash, while "seeing" as many patients as possible in as short a time period as possible. Patients that ask to see a physician are forced to sit for an extended period of time, in what your affiant believes is a deterrent to patients who actually want to be treated for whatever medical ailment they are experiencing. Your affiant has been able to verify the testimony of those involved in criminal activity whose testimony might otherwise be deemed unreliable, through a series of undercover visits by the West Virginia State Police to Mountain Medical, as well as the testimony of others. These practices conducted by Dr. Ryckman and others at the clinic were also substantiated by the action taken against Dr. Ryckman by the West Virginia Board of Medicine in 2004.

98. Your affiant also believes that Mountain Medical's list of local pharmacies for controlled substance prescriptions is an indication of a criminal pattern. It is your affiant's belief obtained through experiences in other health care fraud matters, that physician's operating as "pill mills" will generally only allow their patients to fill their prescriptions at locally owned pharmacies. National "chain pharmacies" such as Rite Aid or Walgreens are staffed with pharmacists who have little or no financial interest in the amount of revenue generated through the sale of controlled substances, in comparison to locally owned pharmacies. Locally owned pharmacies see a direct benefit in filling these controlled substance prescriptions. Therefore, while a pharmacist working at a pharmacy such as Rite Aid may become concerned by the amount of controlled substances being prescribed by a clinic, and would perhaps, take steps to reject such prescriptions and/or alert law enforcement, pharmacists at locally owned pharmacies often turns a blind eye to the clinic's behavior. The physicians working at pill mills realize this and steer their patients towards more agreeable pharmacies.

40

MOO Management

99.  Mountain Medical Care Center, LLC stopped  issuing wages to its employees on February 24, 2009. The clinic employees were then paid through a MOO Management, Inc. account until May 1, 2009 when Dr. Ryckman's State of West Virginia Employer Number was established. He then began to pay employees of Mountain Medical using that number.  MOO Management, Inc., is a West Virginia company, formed in January of 2006, by Myra C. Miller and John J. Miller. According to the West Virginia Secretary of State, Business Organization Information System database, MOO Management  terminating its business on June 17, 2008.

COMPUTER DATA

100. From my experience and training in investigating white collar fraud, I know that individuals engaged in crimes such as these often maintain records pertaining to their crimes as well as instrumentalities and fruits of their crimes at their businesses and residences.   Often this information is stored on computer systems as well as "hard" physical copies.  I know from my training and experience that cellular telephones, computer hardware, software, PDS's, documentation, passwords and data security devices may be important to a criminal investigation in two distinct respects:

A.     The objects themselves may be instrumentalities, fruits or evidence of crime; and/or

B.     The objects themselves may have been used to collect and store information about crimes (in the form of electronic data).

101. Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a

41

variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

A.    Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

B.    Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden", erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

C.    Typically, the volume of data stored on many computer systems and storage devices will be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data

are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

D.      Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files. However, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard", is necessary to decrypt the data into readable form.    In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography".  For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

102. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords and data security devices which are (1) instrumentalities, fruits of evidence of crime, or (2) storage devices for information about crime. I also know from my training and experience as an agent that computer storage devices can store the equivalent of thousands of pages of information. When the user wants to conceal criminal evidence, he/she will often store it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.

This sorting process can take weeks or months, depending on the volume of the data stored, and it would be impractical to attempt this kind of data search on site.

103. Furthermore, I know from my training and experience as an agent that searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The wide variety of computer hardware and software available requires even computer experts to specialize in some systems and applications. Consequently, it is difficult to know before a search which expert should analyze the system and its data.

104. In light of this information and these concerns, I hereby request the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to make mirror images and/or copies of the computer hard drives and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware for this evidence on-site.

Premises to be Searched

A.     Mountain Medical Care Center, located at 35 West Third Avenue, Williamson, Mingo County, West Virginia.

b.     114 West Second Avenue, Williamson, Mingo County, West Virginia and the attached building.

c.     Katherine Hoover's residence in Lost Creek, Harrison County, West Virginia (to include the main house, the adjacent garage with living space above and three out-buildings/barns).

44

d.   The residence of William F. Ryckman, located at 127 American Lane, Sutersville, Westmoreland, County, Pennsylvania.

e.   The residence of Myra C. Miller, 231 Central Avenue, South Williamson, Pike County, Kentucky.

(See photos of each location attached hereto.)

<u>Items to be Seized</u>

105.  I know it is important to obtain complete records for patients to whom it is believed controlled substances were unlawfully prescribed and/or dispensed (see complete patient seizure list), as well as any records/documents relating to billing/income, including billing to any government programs such as Medicare and Medicaid as well as financial information including information to show the income and the assets of Mountain Medical's owner's, operators and employees.  I submit that those items are set forth in Attachment B to the actual Search Warrant and Search Warrant Application, which is incorporated herein by reference.

CONCLUSION

Based upon the above, I submit that there is probable cause to search the premises

described above for the purpose of obtaining evidence of violations of 21 U.S.C. § 846 (conspiracy

to distribute controlled substances); 21 U.S.C. § 841(a)(1) (distribution of controlled substances);

21 U.S.C. § 843(a)(2) (use of a registration number issued to another person); 21 U.S.C. § 843(a)(3)

(obtaining controlled substances by fraud) and 18 U.S.C. §§ 1347 and 2 (Health Care Fraud and

Aiding and Abetting).

And further the affiant saith naught.

_____

M. T. SMITH

Sgt. West Virginia State Police

Taken, subscribed, and sworn to before me this _26th_ day of February, 2010.

HONORABLE MARY E. STANLEY

U.S. Magistrate Judge

46

# COMPLETE Patient Seizure List





Entrance to Mountain Medical Care Center, LLC, 35
West Third Ave., Williamson, WV

Attachment A



Frontview 114 West Second Ave., Williamson, WV



Attachment A



Katherine A. Hoover's Residence
Lost Creek, Harrison County, West Virginia

Attachment A

Ryckman Residence

Attachment A

Myra Miller's Residence

Attachment A

Incorporated 1/11  2:10 mj-00035, 36+37

A F F I D A V I T    2:10 mj-00005

STATE OF WEST VIRGINIA

COUNTY OF KANAWHA, to-wit:

    I, James F. Lafferty II, being duly sworn, hereby depose and state:

    1. I am a Special Agent with the Federal Bureau of Investigation, and have served in this capacity as a Special Agent for approximately seven years. I am currently assigned to the Huntington, West Virginia Resident Agency where I have been assigned to focus my attention towards health care fraud and public corruption matters. Prior to joining the FBI, I received my Bachelor's of Science in Business Administration degree with a focus in accounting. In 1998, I obtained my Certified Public Accounting license, which is still active in the state of West Virginia.

    2. The FBI has provided me with training related to health care fraud matters, as well as financial forfeiture matters related to health care fraud and other criminal acts involving the illegal accumulation of assets.

    3. The information contained in this affidavit has been obtained by or provided to me by individuals knowledgeable of the subject matter, or by others in law enforcement who have provided me with information they have obtained during the ongoing investigation. Therefore, this affidavit does not include every fact gathered during the ongoing investigation, but simply includes

selected facts needed to obtain the probable cause to obtain a seizure warrant for account(s) held at Branch Bank & Trust (BB&T).

## DIANE E. SHAFER, M.D.

4. Diane E. Shafer, M.D., was born in 1952, and graduated from Temple University School of Medicine, located in Pennsylvania, in 1976. The West Virginia Board of Medicine website indicates that Dr. Shafer's lists her primary specialty as orthopaedic surgery. Her secondary specialty is listed as emergency medicine. On December 21, 2009, Dr. Shafer surrendered her license to the WV Board of Medicine. It was originally granted on September 8, 1980. Dr. Shafer owns and operates an office located at 114 West Second Avenue, Williamson, Mingo County, West Virginia 25661. This is also listed as her primary work location on the WV Board of Medicine website.

5. Your affiant has reviewed the West Virginia Board of Medicine website for any disciplinary actions made against Dr. Shafer. In 1988, Dr. Shafer was publicly reprimanded and fined $2,500 by the board for misrepresenting the number of settlements arising from medical professional liability in an application to renew her license to practice medicine and surgery in the state of West Virginia and for failing to inform the board that her privileges to practice medicine at a Kentucky hospital had been subject to disciplinary action. In March of 1989 the public reprimand was withdrawn and set aside and the civil fine assessed

2

of and paid by Dr. Shafer in the amount of $2,500 was ordered to be returned. In 1993, Dr. Shafer's medical license was suspended after Dr. Shafer was convicted of bribing a public servant in the state of Kentucky. Her license was reinstated in April of 1995.

<u>INVESTIGATION</u>

6.   Investigation was initiated from numerous statements provided by individuals to the West Virginia State Police (WVSP) who alleged that Lisa Kaye Baisden, an employee of Dr. Shafer, had provided them with prescriptions signed by Dr. Shafer in exchange for cash or drugs.

7.   On December 1, 2009, members of the WVSP Bureau of Criminal Investigations approached Baisden at her home in Dingess, West Virginia. Baisden advised that she had been employed at Dr. Shafer's office, located in Williamson, West Virginia, for approximately seven years. Baisden's job responsibilities included maintaining daily "Patient Registers," which listed each "patient's" name, date of birth, and their payment method. Baisden was also responsible for billing private insurance companies, to the extent insurance was accepted as payment by Dr. Shafer.

8.   Baisden admitted during the interview that she had been providing patients at Dr. Shafer's office with fraudulent prescriptions for approximately twelve months. Baisden added that she had provided fraudulent prescriptions to approximately twenty to thirty patients on countless occasions. Baisden was compensated

3

by the patients with cash or a portion of the pills illegally obtained by the patients.

9.   Baisden advised that she knew she did not have prescriptive authority and that she and another employee of Dr. Shafer's would hand out the prescriptions to patients when Dr. Shafer was not in the office. Baisden stated that the office would remain open even if Shafer was out of town and that she had no way of contacting the doctor when she was gone. Dr. Shafer had directed the staff to continue handing out prescriptions to patients in her absence.

10.   Baisden advised that Dr. Shafer's employees were able to hand out the prescriptions in Dr. Shafer's absence because Dr. Shafer would fill out and sign the prescriptions and place them in the patient's file with the date left blank. The prescriptions were typically for hydrocodone, a Schedule III narcotic, and alprazolam, a Schedule IV narcotic.

11.   Baisden added that staff would inform Dr. Shafer when patients were going to be overlapping prescriptions by coming into the office for controlled substances before they should have taken all the drugs, if they were taken as prescribed. Dr. Shafer would either disregard her staff or would change the date on the note that the staff would leave Dr. Shafer informing her of when the patient had last visited the office.

4

12.   Baisden also had in her possession thirteen days of Dr. Shafer's Patient Registers which she provided to the West Virginia State Police. Baisden advised that she had maintained the Patient Registers in the event that she would be confronted by law enforcement about her illegal activities. Baisden added that Dr. Shafer "sees" an inordinate amount of patients on a daily basis and that the average patients spends a matter of seconds with the doctor.

13.   Baisden advised that Dr. Shafer does not bill Medicare and that patients with Medicare pay only $20 per office visit, while patients without Medicare generally pay $75 an office visit.

14.   On December 4, 2009, a state search warrant signed by Magistrate Judge Eugene Crum was executed at Dr. Shaffer's office located in Williamson, West Virginia. During the execution of the search warrant, prewritten prescriptions were located. When asked by WVSP Corporal M.T. Smith why she was prewriting and signing prescriptions, Dr. Shafer advised that she did this so she would know what to give her patients. Also seized during the search warrant were over seventy five pre-written prescription forms for Dr. Shafer's patients. It should be noted that Dr. Shafer's handling of pre-signed prescriptions is a violation of West Virginia Code Section 30-3-14(c)(19), and is considered to be gross negligence in control and use of prescriptions.

15.  The condition of Dr. Shafer's office during the execution of the search warrant indicated that it would be physically impossible for her to utilize her examining tables.  (See photographs at Exhibit A.)  She indicated that she examined her patients "at another location."

16.  An analysis was conducted on the number of controlled substance prescriptions filled by Dr. Shafer's patients on December 1, 2009, against four other physicians from the Charleston, West Virginia area. On December 1, 2009, ninety five of Dr. Shaffer's patients filled controlled substance prescriptions in the state of West Virginia. This does not include Dr. Shafer's patients who fill their prescriptions at pharmacies located in Kentucky, which borders the Williamson, WV location of Dr. Shafer's office.  For comparison purposes, two physicians who specialize in internal medicine were randomly selected. On December 1, 2009, a combined forty three patients for both physicians filled controlled substance prescriptions in the state of West Virginia. Two physicians who specialize in pain management were also selected randomly. On December 1, 2009, a combined forty two patients for both physicians filled controlled substance prescriptions in the state of West Virginia. Based on the analysis, Dr. Shafer's patients had more controlled substance prescriptions filled on December 1, 2009, than the combined patients of four physicians located in the Charleston, West Virginia area.

17. An individual concerned with activity at Dr. Shafer's office provided photographs he took in December of 2009 of Dr. Shafer's office during her regular office hours. In the photographs, the line of people which formed to see Dr. Shafer reached the sidewalk and continued down the street. Your affiant counted as many as thirty people waiting outside of the office. (See Exhibit B.)

18. An individual who has been a patient of Dr. Shafer for approximately three to four years advised that Dr. Shafer runs patients through her office "like cattle". On her initial office visit the individual did not receive a physical and the only medical test performed was a measurement of her weight. Dr. Shafer charged $150 to $200 on her initial visit and charged $75 for each subsequent visit. Dr. Shafer did not perform any medical examination of this individual, but provided the individual with her prescription. On occasion, Dr. Shafer would collect the exam fee herself.

19. Your affiant has reviewed patient files obtained during the search warrant executed by the WVSP. The files show that, for each office visit, a patient's blood pressure, weight, and ailments are listed on the chart. Your affiant did not see any doctor's notes of the visit or any referrals for treatment of the patient's ailments. Further substantiating Baisden's allegations that Dr. Shafer spends mere seconds with each patient.

7

20.  A review of the West Virginia Board of Pharmacy doctor's report for Diane E. Shafer, MD revealed that in 2009 on 17,065 occasions, patients of Dr. Shafer filled controlled substance prescriptions in the state of West Virginia.

21.  The West Virginia monitoring program keeps a running tally of the number of controlled substance prescriptions written under a physician's DEA number.  Since the start of the program in approximately December of 2002 through the present, 118,445 controlled substance prescriptions have been filled under Dr. Shafer's DEA number at West Virginia pharmacies.

22.  On December 15, 2009, after learning of a federal investigation into her alleged criminal conduct, Dr. Shafer signed a voluntary surrender of controlled substances privileges form, DEA Form-104.  In this form, Dr. Shafer agreed to voluntarily surrender her controlled substances privileges in view of her alleged failure to comply with the Federal requirements pertaining to controlled substances.

23.  On December 18, 2009, Dr. Shafer sent the West Virginia Board of Medicine a letter formally notifying the board that she was surrendering her license to practice medicine due to medical reasons.  The surrender of the license was effective immediately.

FINANCIAL INVESTIGATION

24.   As discussed earlier in the affidavit, Baisden provided thirteen days of Patient Registers that accounted for patients seen by Dr. Shafer at various dates throughout 2009. A review of the Patient Registers provided by Baisden reveals that, on average, Dr. Shafer "saw" one hundred and thirteen patients per day. Total cash intake for the thirteen day sample was approximately $89,000, not counting insurance payments. Daily cash intake for Dr. Shafer was approximately $6,800, not counting insurance payments. A review of additional Patient Registers obtained by the WVSP during their search warrant of Dr. Shafer's office, leads this affiant to believe that the Patient Registers provided by Baisden were maintained properly and not altered by Baisden, considering the similarities between the Patient Registers provided by Baisden and those maintained by Dr. Shafer.

25.   Your affiant has been able to confirm through a review of the Patient Registers that Dr. Shafer opened her office four days a week. If Dr. Shafer and her staff opened the office fifty weeks out of the year, four days a week, Dr. Shafer's total cash intake would be approximately $1.36 million a year. This excludes funds obtained through the billing of insurance.

26.   Your affiant has reviewed checks provided by Mountain State Blue Cross Blue Shield, payable to Diane E. Shafer, MD. These checks were payments to Dr. Shafer for claims submitted by Dr.

9

Shafer for medical services performed on patients who utilized their health care coverage provided by Mountain State Blue Cross Blue Shield.

27. Your affiant reviewed checks from Mountain State Blue Cross Blue Shield dated: February 22, 2008, April 4, 2008, July 19, 2008, July 17, 2009, September 11, 2009, and November 20, 2009. A review of these checks revealed that these checks were deposited into a BB&T Bank account, account number *****6061.

28. Your affiant has reviewed an account for Diane E. Shafer, maintained at BB&T Bank, account number *****6061, for the months of December 2009 and January 2010.

29. The following deposits were identified in the month of December 2009:

| Date | Amount | Transaction Description |
|------|--------|-------------------------|
| 12/7/2009 | $6,184.57 | Counter Deposit |
| 12/9/2009 | $5,408.00 | Counter Deposit |
| 12/10/2009 | $5,643.14 | Counter Deposit |
| 12/21/2009 | $12,412.34 | Deposit |
| 12/30/2009 | $4,137.70 | Deposit |
| 12/31/2009 | $4,534.00 | Deposit |

30.  The following deposits were identified in the month of January 2010:

| Date | Amount | Transaction Description |
|------|--------|-------------------------|
| 01/7/2010 | $11,817.49 | Deposit |
| 01/07/2010 | $6,000.00 | AM Cash Credit |
| 01/08/2010 | $3,000.00 | AM Cash Credit |
| 01/11/2010 | $6,428.00 | Deposit |
| 01/11/2010 | $6,000.00 | AM Cash Credit |
| 01/11/2010 | $5,678.50 | Deposit |
| 01/11/2010 | $5,000.00 | PM Cash Credit |
| 01/12/2010 | $5,326.96 | Deposit |
| 01/12/2010 | $5,000.00 | AM Cash Credit |

31.  Total deposits into Dr. Shafer's account in the month of December 2009 totalled $38,319.75. Total deposits into Dr. Shafer's account in the month of January 2010 totalled $54,250.95. The beginning cash balance for Dr. Shafer's checking account on December 1, 2009, was $6,472.46. The account balance as of January 13, 2010, was $67,876.

32.  On January 13, 2010, your affiant received information from BB&T Bank that on January 6, 2010, Dr. Shafer visited the Williamson, West Virginia branch of BB&T. Dr. Shafer asked a teller how much money she could deposit before the teller was obligated to report the amount of cash being deposited. Dr. Shafer explained that she needed to put $40,000 into her account by the middle of the month to pay her taxes. The teller explained that she would have to prepare a Currency Transaction Report (CTR) for any cash deposits over $10,000 and that she would need Dr. Shafer's identification in order to complete the paperwork. On January 12,

11

2010, Dr. Shafer returned to the same teller's window after 2:00 p.m. and deposited $5,900 in cash. She then returned to that same teller's window on January 13, 2010 before 2:00 p.m. She handed the teller $4,500 in cash to deposit but then asked the teller if she remembered how much she had deposited the previous evening. The teller informed her that she thought Dr. Shafer had deposited $5,900 the previous afternoon. Dr. Shafer asked that the teller give her back $500. Dr. Shafer then deposited $4,000.

33. Your affiant has also identified two additional accounts at BB&T Bank. The first account, account number ******1820, is a joint account Dr. Shafer maintains with Kevin Maynard and Sara T. Shafer. The balance in this account as of January 13, 2010, was $34,065. A second account, account number ******4279, is a joint account Dr. Shafer maintains with Sara T. Shafer. The balance in this account as of January 13, 2010, was $17,546. Your affiant also learned that Dr. Shafer has a certificate of deposit with BB&T Bank, certificate number ******8611, in the amount of $52,000.

34. Your affiant believes that Dr. Shafer is depositing cash she received from the illegal operation of her medical office in order to pay upcoming taxes that are due as she stated to the BB&T bank teller or for some other unknown purpose. Considering that Dr. Shafer's balance in checking account, account number ******6061, prior to learning that she was under investigation was $6,472.46, and is now $67,876 as of January 13, 2010, and the fact

12

that Dr. Shafer had stopped practicing medicine for a majority of December 2009 and all of January 2010, it appears to your affiant that Dr. Shafer has access to a large amount of cash funds that she is now for whatever purpose trying to introduce into the banking system.

35.  Dr. Shafer maintains two safe deposit boxes at BB&T, Williamson branch.  She had to get the second because the first was full.  It is likely that she secures cash, and other valuables in both safe deposit boxes which are the proceeds of her illegal activities described herein.  It is also likely that Dr. Shafer would secure:

   a.   Titles, books, records, receipts, bank statements and records, money drafts, letter of credit, money order and cashier's checks, receipts, passbooks, bank deposit tickets, safe deposit box keys, and memoranda and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment, and/or expenditure of money.

   b.   Financial and business records, including, but not limited to, books, records, ledgers, journals, receipts, notes, memoranda, address books, and telephone books.

Further, such cash and valuables would be evidence of said crimes.

## CONCLUSION

36.  Based upon the foregoing, I submit that there is probable cause to believe that any and all proceeds on deposit in any and all bank accounts and certificates of deposit in the name of Diane E. Shafer, at Branch Banking & Trust (BB&T), up to the total amount

13

of $1,360,000.00 are forfeitable to the United States pursuant to 18 U.S.C. § 1347; 21 U.S.C. § 846; 21 U.S.C. § 841(a)(1); and/or 21 U.S.C. § 843(a)(3).

Further your affiant sayeth naught.

_____
JAMES F. LAFFERTY II

Sworn to before me, and subscribed in my presence, this 14th day of January 2010.

_____
MARY E. STANLEY
United States Magistrate Judge

14







GOVERNMENT
EXHIBIT